UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| **ROSS ABBOTT, COLLEGE LIBERTARIANS AT THE UNIVERSITY OF SOUTH CAROLINA,** and **YOUNG AMERICANS FOR LIBERTY AT THE UNIVERSITY OF SOUTH CAROLINA,** <br><br> Plaintiffs, <br><br> v. <br><br> **HARRIS PASTIDES, DENNIS PRUITT, BOBBY GIST,** and **CARL R. WELLS,** <br><br> Defendants. | Case No.    3:16-538-MBS <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

Ross Abbott, the College Libertarians at the University of South Carolina ("College Libertarians"), and the Young Americans for Liberty at the University of South Carolina ("YAL") complain of Defendants and allege:

## I.    INTRODUCTION

1.    Free speech controversies roiled American college campuses in the Fall of 2015, including high-profile demonstrations at the University of Missouri and Yale University.  These controversies followed similar eruptions at universities across the country in recent years arising from such issues as race relations, the regulation of offensive speech, restrictions on faculty speech, and the ability of students and faculty members to exercise their First Amendment rights outside of tiny designated areas on campus, ironically-named "free speech zones."  Even the most benign speech – including the ability to distribute copies of the U.S. Constitution – can be censored if conducted outside these quarantined areas, as occurred at University of Hawaii-Hilo and at Modesto Community College in California.  Meanwhile, at the University of South

Carolina ("USC" or the "University"), students learned that it is not safe even to talk about these various free speech controversies without risking enforcement under their school's speech code and famous Carolinian Creed.

2.      The Plaintiffs in this case – Ross Abbott, the College Libertarians, and YAL – found that they could face punishment for just trying to raise awareness among their fellow students about freedom of expression.   Abbott, who serves as President of the College Libertarians, received a "Notice of Charge" letter from the University's Office of Equal Opportunity Programs after he and the two organizations participated in a "Free Speech Event" in late November 2015.  Despite the fact that Abbott and the groups obtained prior approval from the University after fully disclosing that their proposed displays would include expression that has been censored in the past (*e.g.*, a swastika, criticism of the slur "wetback," anti-Israeli sentiment), and notwithstanding their efforts to inform students of the context in which each of the free speech disputes arose, the Office of Equal Opportunity Programs summoned Abbott for questioning after some students complained that the subject matter offended them and that they felt "triggered."

3.      The Office of Equal Opportunity Programs did not take disciplinary action against Abbott or the two student groups this time, but it also declined to change or even clarify its Student Non-Discrimination and Non-Harassment policy that was the basis of Abbott's "Charge Letter."   The policy contains vague and broadly-worded provisions that forbid "unwelcome" or "inappropriate" "verbal conduct" (that is, speech) so that debates about same-sex marriage, racism, the Middle East, immigration policy, "trigger words," or feminism could be subject to investigation and sanction by university authorities.   A notation to the Carolinian Creed, incorporated into the University Policies and Procedures, states "Allegiance to these ideals [of

2

civility] requires each Carolinian to refrain from and discourage behaviors which threaten the freedom and respect every individual deserves." These policies facilitate a "heckler's veto" for other students who believe they have a right not be offended by discussions of serious social issues. And they exert a profoundly chilling effect, as penalties for violating the policies can include expulsion of individuals and disenfranchisement of student organizations.

4.      This civil rights action seeks to protect and vindicate the First and Fourteenth Amendment rights of Ross Abbott, the College Libertarians, YAL, and all students and faculty at the University of South Carolina. The University's speech code and free speech zone policies unlawfully restrict the USC community's constitutional rights to free expression, and strike at the core mission of any university educating students. "State colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). Accordingly, the United States Supreme Court has held that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). By bringing this case, the Plaintiffs intend to reaffirm these basic constitutional values.

## II.    JURISDICTION AND VENUE

5.      This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

6.      This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      The Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and to issue the requested

injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65. The Court is authorized to award attorneys' fees and costs pursuant by 42 U.S.C. § 1988.

8.      Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the instant claim occurred within this District and because at least one Defendant resides in this District.

### III.    PLAINTIFFS

9.      Plaintiff Ross Abbott is a resident of Columbia, South Carolina. He currently serves as the president of College Libertarians at the University of South Carolina.

10.      Plaintiff College Libertarians at the University of South Carolina is a recognized student organization at the University of South Carolina.

11.      Plaintiff Young Americans for Liberty at the University of South Carolina is a recognized student organization at the University of South Carolina.

### IV.    DEFENDANTS

12.      Defendant Harris Pastides is President of the University of South Carolina. He is the university's chief executive officer, responsible for the University of South Carolina's administration and policy-making, and has ultimate authority to approve the policies and pro-cedures challenged herein that were applied to deprive Plaintiffs of their constitutional rights. Defendant Pastides acted under color of state law and is sued for injunctive relief in his official capacity.

13.      Defendant Dennis Pruitt is Vice President for Student Affairs, Vice Provost and Dean of Students at the University of South Carolina. Defendant Pruitt acted under color of state law and is sued for injunctive relief in his official capacity.

14.     Defendant Bobby Gist is the Executive Assistant to the President for Equal Opportunity Programs at the University of South Carolina.  Defendant Gist acted under color of state law and is sued in both his personal and official capacities.

15.     Defendant Carl R. Wells is the Assistant Director of the Office of Equal Opportunity Programs and Deputy Title IX Coordinator at the University of South Carolina. Defendant Wells acted under color of state law and is sued in both his personal and official capacities.

## V.     STATEMENT OF FACTS

### A.     The Free Speech Event

16.     In November 2015, Plaintiffs planned a Free Speech Event at the University of South Carolina to underscore the importance of free expression on college campuses.

17.     Plaintiffs planned to set up tables outdoors on campus with a petition for students to sign in support of free speech rights at the university, as well as information from various free speech organizations on campus and in the community at large.

18.     To draw attention to threats to free speech at college campuses like USC, Plaintiffs planned to create visual displays and handouts depicting censorship controversies that have occurred at USC and other universities throughout the country.

19.     The Free Speech Event was designed to start a conversation at USC regarding free speech on campus and what limitations the First Amendment imposes on universities when they seek to censor students and faculty.

20.     Acknowledging that the event may be controversial, Plaintiffs sought and obtained permission to hold the event from Kim McMahon, Director of Campus Life and the Russell House University Union.

21.     Mr. Abbott provided McMahon a detailed description of the event and attended an hour-long meeting with McMahon to discuss the content of the event and to show her the posters the groups intended to display at the event.

22.     McMahon approved the event, noting: "I see no controversy in educating campus about what is happening in the world.  My goal would be to help you organize in a way that the 'controversy' is a chance to learn and grow (and even be a bit uncomfortable), not further any intolerance, censorship or acts of incivility."

23.     Plaintiffs submitted a space and facilities reservation to hold the event on campus in front of the Russell House University Union building, an area within the university's free speech zone.

24.     Plaintiffs' Free Speech Event took place as planned on November 23, 2015.  At the event Plaintiffs displayed posters and hand-outs referencing censorship incidents at other universities, including:

   a. A November 2015 incident at the University of Missouri, where university police issued a campus-wide email asking "individuals who witness incidents of hateful and/or hurtful speech" to call the police "immediately" so that necessary "disciplinary action" could be taken.  *See* Exhibit A.

   b. Modesto Junior College's threats to punish a student who distributed copies of the U.S. Constitution in observance of Constitution Day outside of the campus's small "free speech area."  *See* Exhibit B.

   c. Chicago State University's attempt to censor a private blog operated by faculty members that criticized the university, resulting in litigation.  In another case at CSU, two students alleged the university shut down the independent student

newspaper, invalidated their election to the student government, and ultimately expelled one of them for drawing attention to alleged corruption at the university. *See* Exhibit C.

d.  Ongoing censorship at Georgetown University, where the university has refused to recognize the student group "H*yas for Choice," contending that the group's reproductive rights position conflicts with that of the university.  *See* Exhibit D.

e.  A March 2015 incident at George Washington University where a Jewish student was suspended, evicted from university housing, and referred to law enforcement for possible commission of a "hate crime" for placing on a residence hall bulletin board a small, bronze Indian swastika that he obtained and learned about on a spring break trip to India.  *See* Exhibit E.

f.  California State University's decision to discipline a sorority for "willful, material, and substantial disruption" of university activities and "disorderly, lewd, indecent, or obscene conduct" for hosting a "Taco Tuesday"-themed recruitment event.  *See* Exhibit F.

g.  Brandeis University's determination that a professor engaged in racial harassment when he used the word "wetback" to explain the origins of, and criticize the use of that slur in his Latin American Politics course.  *See* Exhibit G.

h.  The University of Illinois's decision to rescind a job offer to Professor Steven Salaita because of anti-Israel tweets Salaita made from a personal Twitter account.  *See* Exhibit H.

i.  Northwestern University's censorship of an online university magazine that discussed a nurse performing oral sex on a patient in 1978.  *See* Exhibit I.

7

j.  Marquette University's efforts to revoke the tenure of a political science professor because of writings on his private blog. *See* Exhibit J.

k.  A 2015 incident at USC where a student was expelled without due process after being photographed writing a racial slur on a whiteboard. *See* Exhibit K.

25.  For each of these controversies the Plaintiffs provided information on the context in which the free speech issues arose in order to facilitate student engagement and discussion. They also displayed a poster that read, "I disapprove of what you say, but I will defend to the death your right to say it."

26.  The Free Speech Event also included a "Safe Space," represented by a portable crib and a baby doll. It illustrated the belief that some college students seek to be coddled and protected from controversy by avoiding any ideas that might make them uncomfortable.

27.  The Plaintiffs also displayed a statement of support for free expression at USC, *see* Exhibit L, and a petition for students to affirm their support. *See* Exhibit M. The petition stated, in relevant part, "We, the undersigned members of the Carolina community, pledge to all Carolinians, present and future, that we support and will defend your freedom of thought, conscience, inquiry, speech, expression, and communication. It is our moral obligation to defend the basic rights of all to free speech and expression, whether we support those views or not."

28.  The Free Speech Event also included a "free speech board" for students to write messages to affirm their right to free expression.

29.  The event lasted several hours, during which time Plaintiffs and their members had conversations with passersby about the role of free speech at the university.

**B.    Defendants' Investigation**

30.    The following day, on November 24, 2015, Mr. Abbott received a "Notice of Charge" from Defendant Carl Wells, Assistant Director of the Office of Equal Opportunity Programs at the university ("EOP Office").  The Notice said that Formal Complaints of Discrimination had been filed in response to the Free Speech Event by three students at the university.  *See* Exhibit N.

31.    Defendant Wells' Notice instructed Mr. Abbott to respond within five days over the Thanksgiving holiday to schedule an appointment to "discuss the charges alleged," and notified Abbott that he would need to participate in mandatory mediation to "resolve the complaint."

32.    Should the parties be unable to mediate, Defendant Wells notified Mr. Abbott that his office would "investigate the complaint," which would result in "findings and recommendations" for review by USC's Provost, and its President, Defendant Pastides.

33.    Mr. Abbott was further instructed not to contact any of the complainants, and not to discuss the complaints "with any member of the faculty staff or student body."

34.    The three discrimination complaints against Mr. Abbott regarding Plaintiffs' Free Speech Event were attached to Defendant Wells' correspondence.

35.    Complaint 1 alleged that Plaintiffs "hung several offensive signs at their event," including a "poster that depicted a swastika," and another that "had the word 'Wetback' on it and described what the slur meant."  Ignoring the educational and free speech purposes of the event, the complainant alleged that Plaintiffs "seem to want to use university resources and space to post offensive symbols and racial slurs."

36.    Complaint 1 further alleged that the event was "especially annoying to student organizers who go out of our way at our events to make sure that we limit cursing and sexual

innuendo in order to make our events more palatable to members of the administration," and contended that Plaintiffs "should lose access to University funding for future events" as punishment.

37.    Complaint 1 submitted three photographs purportedly taken of the Free Speech Event.

38.    Complaint 2 described Plaintiffs' "multiple offensive signs," claiming they were "'triggering' to students on campus" and that they purportedly illustrated "how bigoted our student body can be."

39.    Complaint 2 asked that Plaintiffs' future events be limited to the university's "free speech zones when they desire to engage" in so-called "hate speech," and that they be prevented from displaying "symbols that could incite a riot," which "subject other students [and] prospective students to seeing inflammatory posters and offensive imagery."

40.    Complaint 2 attached one photograph purportedly taken of the Free Speech Event.

41.    Complaint 3 alleged the Plaintiffs engaged in discrimination by displaying "[a] flag with a Nazi symbol," and by "refus[ing] to remove it, citing 'free speech' as their reason." Complaint 3 further alleged that "[a] jewish [*sic*] friend was violently triggered by seeing the symbol, and now feels unsafe on campus."

42.    Complaint 3 demanded that university authorities find that Plaintiffs' event constituted a "hate crime against USC's Jewish population" and to require an apology from the event's organizers.

43.    Mr. Abbott called Defendant Wells on November 24 to inquire about the charges and the disciplinary process initiated by the Office of Equal Opportunity Programs.

44.    Defendant Wells confirmed that an investigation into the complaints would comply with university policy EOP 1.01, which details Equal Opportunity Complaint Processing Procedures. *See* Exhibit O.

45.    Defendant Wells further confirmed that if his office's investigation concluded that the case should be sent to the Office of Student Conduct, Mr. Abbott would be subject to that office's authority to impose sanctions ranging from mandatory education/awareness classes, to suspension, or even expulsion.

46.    At no point during their November 24 conversation did Wells identify what university policy Mr. Abbott was alleged to have violated by participating in the Free Speech Event.

47.    USC's Student Non-Discrimination and Non-Harassment Policy is set forth in STAF 6.24. *See* Exhibit P. The policy prohibits discrimination and harassment on the basis of all "federally protected categories of student characteristics as well as those characteristics protected as a matter of USC policy."

48.    A student can violate STAF 6.24 by engaging in "unwelcome" or "inappropriate" verbal conduct (meaning "speech"). The prohibitions in STAF 6.24 include "objectionable epithets, demeaning depictions," "unwelcome and inappropriate letters, telephone calls, electronic mail, or other communication," "repeated inappropriate personal comments," speech that employs "sexual innuendos and other sexually suggestive or provocative behavior," and even "suggestive or insulting gestures or sounds." STAF 6.24 defines none of these terms.

49.    Likewise, under the Carolinian Creed, members of the community are obliged not to engage in speech or behavior that may "compromise or demean the dignity of

11

individuals or groups," including such things as taunting, teasing, baiting, ridiculing or insulting others. The Carolinian Creed not only requires members to avoid such expression, but states that students "have an affirmative obligation to confront and challenge, respond to or report the behaviors whenever or wherever they are encountered." *See* Exhibit Q.

50.     Under the STAF 6.24 "Complaint Procedures," students who are the subject of complaints must go through "Resolution Procedures" even if their speech is constitutionally protected under the First Amendment of the U.S. Constitution. If a complaint is not resolved informally pursuant to the "Resolution Procedures," the complainant has the right to initiate formal proceedings.

51.     Sanctions for individual violations of STAF 6.24 may include expulsion, suspension, conduct probation, conditions or restrictions on University privileges, written warnings, fines or restitution, housing sanctions, required attendance at educational or community service events, and "any other sanctions deemed appropriate by the EOP Office and OSC."

52.     Sanctions for student organization violations of STAF 6.24 may include permanent revocation of organizational registration, suspension of rights and privileges for a specified time, conduct probation, conditions or restrictions on University privileges, written warnings, fines or restitution, housing sanctions, required attendance at educational or community service events, and "any other sanctions deemed appropriate by the EOP Office and OSC."

53.     Whenever an informal resolution of a complaint is achieved under STAF 6.24, the EOP Office must make a written report of the resolution that is filed with a copy of the

complaint.  If the complaint is not settled by informal resolution, the EOP Office proceeds to a formal resolution.

54.     If the EOP Office finds no reasonable cause to believe that illegal discrimination or harassment has occurred, it will dismiss the complaint and advise the complainant that if he or she is dissatisfied with the decision, a complaint can be filed with the Office of Civil Rights of the United States Department of Justice.

55.     Where the EOP Office finds that a complaint does not make out a case of illegal discrimination or harassment, it may elect to inform the University community of the occurrence(s) "in order to educate the community about issues presented by the behavior and reaffirm the University's commitment to equal opportunity."   STAF 6.24, § II.B.2.b.i. Theoretically, the EOP Office could use such occasions to educate the University community about the school's commitment to freedom of expression as guaranteed by the United States Constitution, but the policy says nothing about doing so.

56.     STAF 6.24 requires the EOP Office to provide an annual report to the President summarizing discrimination and harassment complaints and the resolution (both informal and formal) of the complaints.

57.     Mr. Abbott met with Defendant Wells on December 8, 2015 for 45 minutes. Michael Kriete, the President of Plaintiff YAL, also attended the meeting.

58.     At the outset of the meeting, Mr. Abbott presented Defendant Wells with a letter pursuant to University policies (EOP 1.01, § II(C)3(b)), setting forth his defense of Plaintiffs' Free Speech Event.  *See* Exhibit R.  Nevertheless, during the meeting Wells required Mr. Abbott to answer for and explain each poster that was subject to a complaint.

59.     Mr. Abbott asked Defendant Wells why he was required to attend the meeting to answer for his speech and that of the student organizations since the event had been approved by the University.  Mr. Abbott added that he would not agree to a mediated resolution or other type of "plea bargain" of any complaints because he had done nothing wrong by participating the Free Speech Event.

60.     Mr. Abbott's letter stressed that "it is vital to me and to the general atmosphere of free speech on our campus that the continuing cloud over the exercise of my First Amendment rights be lifted as soon as possible."

61.     Mr. Abbott's letter set forth several actions the University would need to take to prevent its policies from chilling the exercise of constitutionally-protected speech. Specifically, it sought: (1) a letter terminating the proceeding and a written commitment that no further actions will be taken, and no sanctions imposed, on Abbott, the College Libertarians, or YAL because of the Free Speech Event, and that the complaints be expunged; (2) written clarification of how the University's policies are to be interpreted and applied so as not to conflict with students' First Amendment rights, including a commitment that the University will not find that illegal discrimination or harassment has occurred unless the behavior in question is severe, pervasive, and objectively offensive; (3) that the University join the statement produced by a committee at the University of Chicago ("Chicago") reaffirming the importance of free speech in a university setting that Chicago and several other universities have adopted as a binding commitment to principles of free expression.  Among other things, the Chicago statement provides:  "Debate or deliberation may not be suppressed because the ideas put forth are thought by some or even by most members of the University community to be offensive, unwise, immoral, or wrong-headed."

14

62.     On December 23, 2015, Defendant Wells sent a letter to Mr. Abbott notifying him that the Office of Equal Opportunity Programs would not "move any further in regard to this matter," and "found no cause for investigating this matter."  However, Defendant Wells failed to meet, or even acknowledge, the letter's other requests.

63.     As a consequence, the December 23, 2015 letter provided no clarification of the University's policies on harassment and discrimination, declined to adhere to constitutionally-approved standards, and gave no assurances that the Plaintiffs would not face future enforcement if they engaged in speech protected by the First Amendment.

64.     The December 23, 2015 letter also did not terminate the complainants' ability under University policies to pursue remedies against the Plaintiffs for the Free Speech Event, and it did not commit to removing notation of the complaints in University records for Abbott or the two organizations.

**C.     Unconstitutional Free Speech Zone Policy**

65.     USC enforces a Campus Solicitation policy, STAF 3.17, to restrict student expressive activities to limited areas of the campus.  *See* Exhibit S.

66.     STAF 3.17 defines solicitation activities broadly to include: (1) "Soliciting funds or sales or demonstrations that may result in sales"; (2) "Distributing advertising or other materials"; (3) "Compiling data for surveys, programs, or other purposes"; (4) "Recruitment of members or support for an organization or cause"; or (5) "Providing educational information sessions (exclusive from formal University of South Carolina academic classes)."

67.     While STAF 3.17 provides that "University Organizations and Departments," including registered student organizations, may "solicit in designated areas and under prescribed conditions," the policy does not allow for individual student solicitation activities.

68.    Solicitation activities are only permitted in the following areas: (1) specific areas of the Russell House University Union (including the front and back patios, Davis field, ballroom, meeting rooms, and main lobby; (2) Greene Street (between the gates only and at specified times); (3) Pickens Street Bridge (student organizations only); (4) designated areas of the Coliseum walkway (student organizations only); (5) designated areas of academic building lobbies upon the approval of the appropriate academic dean and the Associate Vice President for Student Life; and (6) other, unspecified, "designated locations upon the approval of the Associate Vice President for Student Life."  These designated areas constitute only a small fraction of the open space on campus.

69.    STAF 3.17 further imposes limitations on students' ability to distribute literature, by restricting the distribution of literature to areas designated for solicitation and requiring student to register and reserve their access to those areas with the Department of Student Life.

70.    The posting of literature is similarly restricted to "appropriate reserved areas of bulletin boards in University buildings or on the Carolina Information Boards located at various outdoor points around the campus."

71.    STAF 3.17 limits students' conduct during approved solicitation activities within designated areas, noting that such activities must be "confined to the designated display space only," and that individuals engaging in solicitation are not to "harass" or "harangue" passersby.

72.    STAF 3.17 prohibits students from engaging in solicitation activities, as broadly defined by the policy, in the residence halls.

73.    STAF 3.17 also does not allow for spontaneous expressive activities or distribution of literature.  Instead, STAF 3.17 states that university organizations may access designated solicitation areas only after completing a facility reservation and event registration form and paying a $29.00 fee.

74.    The university's Use of University Facilities policy, STAF 3.25, further imposes a two-week registration requirement for any outdoor event held on campus.  All such events must be approved by the Director of Student Life upon submission of a detailed written request.  *See* Exhibit T.

75.    Together, these policies have a chilling effect on Plaintiffs' rights, and those of all other students to engage freely and openly in expressive activities, including solicitation of petition signatures, distribution of literature, and student group recruitment.

76.    YAL has been instructed by University officials not to engage in expressive activities, such as handing out copies of the U.S. Constitution, in areas outside the USC free speech zone.  YAL has been instructed instead to reserve time to engage in their expressive activities only within the areas on campus designated for "solicitation."

77.    Defendants' policies and actions create a hostile atmosphere for free expression on campus, chilling the speech of other registered student organizations, as well as students, who are not before the Court.

## VI.    CAUSES OF ACTION

### COUNT I

**As-Applied Violation of Plaintiffs' Rights to Free Speech Under
the First and Fourteenth Amendments (42 U.S.C. § 1983)
<u>(Defendants Gist and Wells)</u>**

78.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

79.     The First and Fourteenth Amendments extend to campuses of state colleges and universities. *Healy v. James*, 408 U.S. at 180.

80.     The First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). Our institutions of higher learning play a central role in a system of freedom of expression because "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180. In this regard, "[t]he first danger to liberty lies in granting the State the power" to limit freedom of expression in contravention of the "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995).

81.     To say that the Plaintiffs cannot even discuss free speech controversies without triggering complaints and an investigation under USC's policies is an affront to both the mission of the University and to the purpose of the First Amendment. "[T]he mere dissemination of ideas – no matter how offensive to good taste – on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

82.     The Supreme Court has long recognized that "words are often chosen as much for their emotive as cognitive force," and that "we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Cohen v. California*, 403 U.S. 15, 26 (1971). The First Amendment forbids the government from censoring speech based on "personal predilections," and "the State has no right to cleanse the public debate to the point where it is grammatically palatable to the most

squeamish among us." *Id.* at 21, 25.  "There is no categorical 'harassment exception' to the First Amendment's free speech clause."  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).

83.     By investigating Plaintiff Ross Abbott's involvement in Plaintiffs' Free Speech Event, Defendants have explicitly and implicitly chilled Plaintiffs' free expression as well as that of all USC students.  "Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference in these matters."  *Sweezy v. State of N.H.*, 354 US. 234, 249 (1957).  The Supreme Court has long recognized the "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association" that is the "more immediate and substantial" result of governmental investigations into lawful expressive activities.  *Gibson v. Florida Legis. Investigation Comm.*, 372 U.S. 539, 556-57 (1963).

84.     To require Mr. Abbott or other students to submit to an official inquiry about their Free Speech Event based on claims that other students felt "offended" subjects the Plaintiffs to a "heckler's veto."  However, the courts have long made clear that the First Amendment prevents speakers from being silenced or sanctioned simply because listeners may object to their speech.  *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228 (6th Cir. 2015) (*en banc*).

85.     Defendant Wells acknowledged that the basis for conducting his investigation into Plaintiff Abbott's involvement in the Free Speech Event was complaints regarding the content Plaintiffs' speech pursuant to USC policies.

86.     The Defendants' decision not to further pursue sanctions against Mr. Abbott at this time does not preclude the complainants from seeking formal sanctions against him under

the University's policies.  Nor does it preclude sanctions against the College Libertarians or YAL as a result of the Free Speech Event.

87.    Defendants violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Plaintiffs under 42 U.S.C. § 1983.

88.    The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief.

89.    Additionally, Plaintiffs experienced emotional injury as a consequence of being denied their First Amendment rights.

## COUNT II

**Facial Challenge to Violation of Right to Free Speech Under the Plaintiffs'
First and Fourteenth Amendment Rights (42 U.S.C. § 1983)
(Defendants Pastides, Pruitt, Gist and Wells)**

90.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

91.    The First Amendment does not permit the government to subject speech to overly broad regulation.  *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).  Any regulation that does so is invalid "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression [.]"  *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003).

92.    USC's Student Non-Discrimination and Non-Harassment Policy, STAF 6.24, is unconstitutional because it prohibits "unwelcome" and "inappropriate" speech, including "objectionable epithets, demeaning depictions," "unwelcome and inappropriate letters, telephone calls, electronic mail, or other communication," "repeated inappropriate personal

comments," speech that employs "sexual innuendos and other sexually suggestive or provocative behavior," and even "suggestive or insulting gestures or sounds."

93.     In addition, under the Carolinian Creed, members of the community are obliged not to engage in behavior that may "compromise or demean the dignity of individuals or groups," including such things as taunting, teasing, baiting, ridiculing or insulting others. None of these terms are narrowly limited or defined.

94.     By subjecting speech to possible review and punishment based on such expansive terms, USC policies stifle robust debate and disregard the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270.   Furthermore, the policy impermissibly imposes "special prohibitions on those speakers who express views on disfavored subjects," namely those whose opinions are believed to "unwelcome" or "inappropriate" or containing "sexual innuendo and other sexually suggestive or provocative behavior." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992).

95.     The broad and undefined terms of STAF 6.24 and the Carolinian Creed vest University officials with unbridled discretion in their ability to review and restrict student speech.

96.     The University of South Carolina's policies governing expression are unconstitutionally overbroad, do not serve a significant governmental interest, are not narrowly drawn, and impermissibly restrict student and student expression.   They burden far more speech than is necessary to serve the asserted interest of minimizing discrimination and harassment at the university.

97.    Defendants' policies also are unconstitutionally vague in violation of the First Amendment and of the due process guarantee of the Fourteenth Amendment to the U.S. Constitution.  A state enactment also is void for vagueness if the prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 1972).  The terms of STAF 6.24 and the Carolinian Creed are generalized, subjective, and incapable of precise definition or application.  The policy does not define the nebulous terms that can be used to restrict speech.

98.    As a direct result of the Defendants' Student Non-Discrimination and Non-Harassment Policy and the Carolinian Creed, students and faculty at USC are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

99.    As a consequence of the Defendants' violation of Plaintiffs' and other similarly situated students and faculty's First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## COUNT III

**Facial Challenge to Violation of Right to Free Speech Under the Plaintiffs' First and Fourteenth Amendment Rights (42 U.S.C. § 1983) – Free Speech Zone Policy (Defendants Pastides and Pruitt)**

100.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

101.    Through policy and practice, including enforcement of STAF 3.17 and STAF 3.25, Defendant has promulgated and enforced a *de facto* Free Speech Zone policy that prohibits free expression on all but a tiny fraction of the University of South Carolina campus,

despite the fact that the university has many open areas and sidewalks that are suitable for expressive activities.

102.     Restricting all First Amendment activity to designated "solicitation areas" impermissibly restricts student expression, does not serve a significant government interest, and is unconstitutionally overbroad.

103.     Students have a First Amendment right to engage in expressive activities and to distribute written materials in the public areas of a state college without obtaining advance permission from government officials.  *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981); *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667 (1973).

104.     A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality.  *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009).

105.     Advance notice and permitting requirements are presumptively invalid because of the significant burden they place on free speech.  The Supreme Court has labeled prior restraint on speech as "the essence of censorship."  *Near v. Minnesota*, 283 U.S. 697, 713 (1931).  Such restrictions are "the most serious and the least tolerable on First Amendment rights."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

106.     Any such permitting requirement violates the First Amendment unless it contains narrow, objective, and definite standards to guide the licensing authority.  *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969).

107.     Restrictions on expressive activity are void for vagueness if their terms are not clearly defined such that a person of ordinary intelligence can readily identify the standards to be applied.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

108.    Regulations that grant an administrative body or government official unfettered discretion to regulate the licensing of activities protected by the First Amendment are unconstitutional. *Kunz v. New York,* 340 U.S. 290, 294 (1951). Such unrestricted discretion increases the likelihood that the government official may discriminate based upon the content of the "speech" or the viewpoint of the speaker. *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 763-64 (1988).

109.    Regulations requiring a permit and fee before authorizing public speaking are prior restraints on speech that are presumptively unconstitutional. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

110.    Any regulation that imposes a fee upon the exercise of First Amendment rights must be content-neutral, strictly limited to recouping actual administrative costs, and bounded by narrowly drawn, reasonable and definite standards.

111.    Through policy and practice Defendants have promulgated and enforced a Free Speech Zone policy that prohibits free expression on all but a fraction of the USC campus, despite the fact that the University has many open areas and sidewalks that are suitable for expressive activities.

112.    Defendant Pastides is responsible for USC's administration and policy-making and has ultimate authority to approve the *de facto* Free Speech Zone policy challenged herein.

113.    Defendant Pruitt authorized the *de facto* Free Speech Zone policy challenged herein.

114.    As a consequence of the Defendants' violation of Plaintiffs' and other similarly situated students' First and Fourteenth Amendment rights, as alleged above, all of which is

irreparable injury *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## COUNT IV

### Declaratory Judgment and Injunction (28 U.S.C. § 2201, et seq.)

115.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

116.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning Plaintiffs' rights under the United States Constitution.  A judicial declaration is necessary and appropriate at this time as to Counts I through II above.

117.     Plaintiffs are seeking a judicial determination of their rights against Defendants as they pertain to Plaintiffs' right to speak without being subjected to unconstitutional speech policies that impose prior restraints on speech, give school officials unfettered discretion whether to allow expression and under what conditions, and that are vague, overbroad, and not narrowly tailored to serve a substantial governmental interest.

118.     To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the University of South Carolina's Student Non-Discrimination and Non-Harassment Policy and the Carolinian Creed are unconstitutional, both on their face, and as applied to the Plaintiffs.

119.     To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the University of South Carolina's Free Speech Zone Policy unconstitutional on its face.

120.    Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, this Court should issue a permanent injunction prohibiting the Defendants from enforcing their restrictions on USC faculty and students' expressive activities to the extent they are unconstitutional, to prevent the ongoing violation of constitutional rights.  University of South Carolina faculty and students are suffering irreparable harm from continued enforcement of unconstitutional policies, monetary damages are inadequate to remedy their harm, and the balance of equities and public interest both favor a grant of injunctive relief.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Ross Abbott, the College Libertarians, and YAL respectfully request that the Court enter judgment against Defendants and provide Plaintiffs the following relief:

A.    A declaratory judgment stating that Defendants' Student Non-Discrimination and Non-Harassment Policy, facially and as-applied to Plaintiffs, is unconstitutional facially and as-applied, and that they violated Plaintiffs' rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

B.    A permanent injunction restraining enforcement of Defendants' unconstitutional Student Non-Discrimination and Non-Harassment Policy and its underlying enforcement practices;

C.    An injunction requiring the Defendants to remove any notation of the complaints against Plaintiffs' Free Speech Event from University records;

D.    A declaratory judgment that Defendants' review of Plaintiffs' expressive activity violated their First and Fourteenth Amendment rights;

E.    Monetary damages in an amount to be determined by the Court to compensate Plaintiffs for the impact of a deprivation of fundamental rights;

F.     Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988, and other applicable law; and

G.     All other further relief to which Plaintiffs may be entitled.

## VIII.     DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues properly triable by jury in this action.

DATED:  February 23, 2016

Respectfully submitted,

 s/Edward T. Fenno
EDWARD T. FENNO
efenno@fennolaw.com
FENNO LAW FIRM, LLC
171 Church St., Suite 160
Charleston, SC 29401
Telephone: (843) 720-3747

ROBERT CORN-REVERE
     (*pro hac vice motion to be filed*)
bobcornrevere@dwt.com
RONALD G. LONDON
     (*pro hac vice motion to be filed*)
ronnielondon@dwt.com
LISA B. ZYCHERMAN
     (*pro hac vice motion to be filed*)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Telephone: (202) 973-4200

Attorneys for Plaintiffs Ross Abbott,
the College Libertarians at the University
of South Carolina, and the Young Americans for Liberty
at the University of South Carolina