# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# COLUMBIA DIVISION

| | |
|---|---|
| Ross Abbott, College Libertarians at the University of South Carolina and Young Americans for Liberty at the University of South Carolina, <br><br>    Plaintiff,<br><br>v.<br><br>Harris Pastides, Dennis Pruitt, Bobby Gist and Carl R. Wells,<br><br>    Defendants. | Civil Action No.<br>3:16-538-MBS<br><br><br><br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (DEFENDANTS GIST AND WELLS)** |

## STATEMENT

Defendants Bobby Gist and Carl R. Wells have moved for summary judgment regarding the damage claims against them. These Defendants are entitled to dismissal based on qualified immunity, as well as the absence, for the most part, of even colorable allegations of a claim for damages against them.

## FACTS

Plaintiffs are a student (who has now graduated) and two student organizations at USC who held an event they entitled the "Free Speech Event" at USC on November 23, 2015.[1] Complaint, ECF No. 1, ¶ 24. It is undisputed that prior to the event, Plaintiffs sought and obtained permission to hold the event from Kim McMahon, Director of Campus Life and the

---

[1] 1 The student organizations are the College Libertarians at the University of South Carolina ("Libertarians") and the Young Americans for Liberty at the University of South Carolina ("YAL").

1

Russell House University Union. *See* Complaint ¶ 20. Plaintiffs self-described the content of the event as "controversial." Complaint ¶ 20.

Consistent with USC's content neutral policy, Plaintiffs received no objection from the University to hold their event as planned. In fact, Ms. McMahon went so far as to advise Mr. Abbott that "[m]y goal would be to help you to organize it in a way that the 'controversy' is a chance to learn and grow (and even be a bit uncomfortable), not further any intolerance, censorship or acts of incivility." Exhibit 1, attached.

Plaintiffs held their event unfettered by the University in the space and on the date they requested.[2] The University's Office of Equal Opportunity Programs ("EOP") received three student complaints about Plaintiffs' event and the Plaintiffs' behavior at the event. Students complained about the display of a swastika, use of the word "wetback" and other concerns related to the event, including Plaintiffs "engaging rudely with USC students, saying sexist and racist statements." ECF No. 1-14, Complaint Exhibit N at 8. The students' complaints included concerns that the event discriminated against protected groups and created a hostile environment. *Id.* at 3, 8, 11.

While the event was occurring, several other complaints were forwarded by e-mail to Kim McMahon, who as previously noted, was the Director of Campus Life and the Russell House University Union, and who had authorized the event. Ms. McMahon was tied up in a training event at the time, but advised that "This is free speech and they are in a free speech area and if they are being respectful and trying to help learn and create dialogue then I am not sure how to help those who are uncomfortable by it." Ex. 2, attached. A few minutes later, in response to another e-mail from a USC staffer, Ms. McMahon stated that "Discomfort is not surprising but

---

[2] Plaintiffs have not alleged that they made any request to hold the event anywhere other than where it was held. Nothing about Plaintiffs' request was denied, modified, or curtailed.

they are hosting a free speech education event with a variety of situations that have been cited as examples of violation of free speech on other campuses. As I am not there I can't provide context and if group is doing what their event said it would." Ex. 3, attached.

This need to examine the context of Plaintiffs' speech, and to ensure that the three students who filed complaints were not suffering illegal discrimination or harassment, led EOP Assistant Director Carl Wells on the following day to inform Mr. Abbott of the complaints and to begin the process to understand the students' complaints and what occurred that day. ECF No. 14-1, Complaint Ex. N at 1.[3] In response to Mr. Wells' letter, Mr. Abbott and Michael Kriete, President of YAL, met with Defendant Wells for 45 minutes on December 8, 2015. Complaint ¶¶ 57-58. Plaintiff Abbott made a recording of the meeting and provided Defendant Wells with a copy of the recording. A transcript of the meeting is attached as Exhibit 4.

At the outset of the meeting, Wells advised Abbott about the preliminary nature of the meeting, describing it as "pre-complaint mode" or "pre-investigation mode:"

> [A]s of today, I'm just talking with you about that, just to get a sense of what the event was and why it was presented and who sponsored it. I guess the who, what, when, whys and hows, is where we are, just to get a sense of it since there was such a amount of a concern that surfaced. . . . We are in pre-complaint mode where we are trying to determine and we are assessing whether or not, because we don't have enough information right now, we're trying to assess whether or not what was presented to us by members of this community actually rise to a level of something that would be a complaint or whether we're going to do an investigation or not. So, again, we are in pre-investigation mode.

---

[3] The initial letter to Mr. Abbott contained a scrivener's error in that it said it enclosed a Notice of Charge. In fact, no charge was made and no Notice of Charge was included with the letter – nor is one included in Plaintiffs' Exhibits attached to the Complaint.

3

Ex. 4 at 1-2. These characterizations were repeated throughout the meeting. Wells further advised Abbott that "I'm just trying to discover what the context was." *Id.* at 4. Shortly thereafter, he reiterated that

> Because I get a picture from someone, because I get a complaint from someone, does not mean that we are investigating. I just need to know the context. So we're here exploring with you now what was your event and what was the context of it.

*Id.* at 7. Later in the meeting, at which Abbott did most of the talking, Wells advised that "the next step is for us to determine whether we will open an investigation or not." *Id.* at 28.

The policy governing discrimination complaints involving students (EOP 6.24, Equal Opportunity Complaint Processing Procedures, ECF No. 1-16, Complaint Exhibit P), outlines the process for making, responding to, and resolving complaints such as those filed by students with regard to Plaintiffs' event. One resolution available to USC is to not pursue the complaints. This is what USC decided to do after Wells' review of what occurred according to Mr. Abbott and his review of the complaints in light of the information Mr. Abbott provided.[4] On December 23, 2015, Defendant Wells sent a letter to Mr. Abbott notifying him that the EOP office would not 'move any further in regard to this matter,' and 'found no cause for investigating this matter." Exhibit 5, attached. (Although there are over 80 pages of attachments to the Complaint, those

---

[4] Absent that initial review, however, USC would not have an informed basis either to move forward or to decline to move forward with a discrimination or hostile environment complaint. Plaintiff Abbott complains that he received a letter from the EOP about the students' complaints and that he was asked to respond to their allegations. He also complains that mutually agreeable mediation was suggested. Mr. Abbott claims both these circumstances violate his free speech rights; however, he fails to understand that universities must review discrimination complaints brought to them. The offered mutually-agreeable mediation is voluntary and often used as a way for students to begin a dialogue about issues affecting the University community members, not as a punishment of any student. See ECF No. 1-16 at 7, Complaint Exhibit P, EOP 6.24 II (B)(1) (complaint may be resolved informally through mediation).

attachments did not include this December 23, 2015, letter advising that the matter was ended.).[5]

No further action has occurred on the part of USC, which is consistent with its letter to that the EOP office found no cause to investigate.

Plaintiffs filed their Complaint on February 23, 2016.

## ARGUMENT

### 1.     The Defendants sued individually for damages are entitled to qualified immunity under 42 U.S.C. § 1983.

The law regarding qualified immunity has been set forth in a case in this District as follows:

> Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Courts considering whether to dismiss a complaint based on qualified immunity should consider both "whether the facts that a plaintiff has alleged ... or shown ... make out a violation of a constitutional right" and "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* at 232, 129 S.Ct. 808 (citations omitted).

*McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 555-556 (D.S.C. 2013).

The Fourth Circuit has summarized the procedural aspects of qualified immunity as follows:

> The qualified immunity inquiry asks (1) whether an official violated a federal right, and (2) whether that right was clearly established at the time the official acted. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001). A court may address the second question—whether a right is clearly established—without ruling on the first—

---

[5] Plaintiff Abbott complains that USC has not confirmed that the file related to this matter is not in his student file; however, the USC policy makes it clear that the file related to any EOP complaints is kept in confidence in the EOP office, and not in student files. See Complaint Exhibit O, EOP 1.01, II (F)(2).

5

>existence of the right. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009).

*Hensley v. Koller,* 722 F.3d 177, 181 (4th Cir. 2013).

In *Wilson v. Layne*, 141 F.3d 111 (4th Cir. 1998), the Fourth Circuit held that "[t]he law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." 141 F.3d at 114. *See also*, *Doe ex rel. Johnson v. South Carolina Dept. of Social Services*, 597 F.3d 163, 176-177 (4th Cir. 2010) (granting qualified immunity where no precedent from Supreme Court or the Fourth Circuit clearly established existence of constitutional right).

Plaintiff has sued only Defendants Gist and Wells in their individual capacities for damages. Complaint, ECF No. 1 at 5, ¶¶ 14, 15. As to Defendant Gist, the Complaint is devoid of allegations of personal involvement by him. The only references to him in any of the Complaint's four counts are in parenthetical references to him at the beginning of Counts I and II. Complaint, ECF No. 1 at 17, 20. As a result, Defendant Gist should be dismissed on the ground that Plaintiffs have failed to allege the necessary element in a Section 1983 claim of personal participation by a state official. *See, e.g., Wright v. Collins*, 766 F.2d 841, 849-850 (4th Cir. 1985)(defendant in a Section 1983 action must be affirmatively shown to have acted personally in the deprivation of the plaintiff's rights).

As for Defendant Carl Wells, Plaintiffs do not allege that he did anything that amounted to a violation of a constitutional right of the Plaintiffs.[6] Plaintiffs' Free Speech Event occurred as

---

[6] The only individualized allegation against Defendant Wells is in Paragraph 85 of Count I, which merely alleges that Defendant Wells actions were the result of complaints regarding the November 23, 2016 event. Regarding Count II, Defendant Wells, like Defendant Gist, is mentioned only in a parenthetical reference. Complaint, ECF No. 1 at 20. As a result, Count II is devoid of any allegations of personal participation by Defendant Wells.

6

they requested. Plaintiffs were well aware that their speech could be something which others might regard as offensive. Indeed, the whole point of the event was to show that speech viewed by some as offensive would not necessarily violate the First Amendment. Ms. McMahon, the USC official who permitted the Free Speech Event was also well aware of Plaintiffs' legitimate purpose, and actually affirmed the general concept which Plaintiffs were seeking to advance. *See* Exhibits 1, 2 and 3.

Of course, however, it is one thing for a person to display examples of constitutionally-protected communications that others have found offensive in order to show the reach of constitutional protection, and it is another thing to be the actual purveyor of offensive communications. As Ms. McMahon noted, she knew what she had authorized, but once the event got underway, she was not present at it and could not "provide context and if group is doing what their event said it would." Exhibits 2 and 3. In other words, there was always the possibility that Plaintiffs had gone beyond their stated purpose, and had engaged in speech that, for example, might have been "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

In order to ensure that nothing along such lines occurred, it was not only advisable, it was mandatory that the University conduct at least a preliminary inquiry as to what actually occurred, especially in light of the number of complaints received. Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c, prohibits discrimination on the basis of race, color, sex, religion, or national origin by public elementary and secondary schools and public institutions of higher learning. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits discrimination on the basis

7

of race, color, or national origin by entities receiving federal funds. These civil rights statutes require USC to provide its faculty, staff and students an environment free of unlawful discrimination or harassment. The United States Department of Education's Office for Civil Rights (OCR) requires schools, including colleges and universities, to do the following whenever unlawful harassment may have occurred:

> When responding to harassment, a school must take immediate and appropriate action to investigate or otherwise determine what occurred. The specific steps in a school's investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. In all cases, however, the inquiry should be prompt, thorough, and impartial.

OCR's October 26, 2010 Guidance Letter, page 2, Exhibit 6, attached..

Defendant Wells, whose duties encompassed such matters, accordingly asked Plaintiff Abbott to meet with him.[7] Defendant Well's limited involvement commenced only after the event concluded and concerned itself only with discrimination and hostile environment complaints pursuant to a USC policy that explicitly excludes First Amendment speech. Plaintiff Abbott recorded the entire 45-minute meeting. A review of the transcript of that recording, parts of which have already been quoted above, indicates that the meeting was as low-key as could be imagined.

Plaintiffs' argument amounts to saying that they have an absolute right to say anything they wish, and that the University cannot even inquire into anything they say. This, however, cannot be a correct statement of the law in an area where, as noted above, the right of other

---

[7] Wells never addressed any communications to either of the organizational Plaintiffs. Michael Kriete, president of one of the plaintiff organizations, voluntarily attended the meeting between Wells and Abbott, but there is nothing about this matter which could possibly cause either of the organizational Plaintiffs to claim that they suffered compensable damages as a result of any act of any Defendant.

students to be free from objectively offensive speech provides at least some degree of a brake on Plaintiffs' right to speak. Thus, for instance, in another area in which a person's rights come into collision with the state's duty to inquire into possible violations of the rights of others, it has been held that "There is no constitutional right to be free from child abuse investigations." *Kauch v. Dep't for Children, Youth & their Families*, 321 F.3d 1, 4 (1st Cir. 2003). *See also, e.g., Popovic v. United States,* 997 F. Supp. 672, 678 (D. Md. 1998), aff'd, 175 F.3d 1015 (4th Cir. 1999)("[a]n individual has no constitutional right not to be investigated for suspected violations by agencies authorized to conduct such authorizations").

This principle applies all the more strongly where, as here, the process never reached the point where an investigation had commenced. *See, e.g.,* Exhibit 4 at 2, where Wells advised that "we are in pre-investigation mode." There is obviously no right to be free from any inquiry whatsoever into what a person may have said. To hold otherwise would be to vitiate the protection of students against harassing speech that is objectively offensive, and thus would be to contravene such cases as *Davis Next Friend, supra.*

As the transcript of the meeting makes abundantly clear, Wells was merely determining the scope of the speech and the complaints in order to determine whether the speech was constitutionally protected speech. Wells is not alleged to have acted unreasonably. Instead, he performed his job reasonably within the often-murky area at the intersection of constitutionally protected free speech and federally protected groups' rights to not be subjected to illegal discrimination and harassment. Plaintiffs cited no case law or statute that would alert Defendant Wells that reviewing multiple complainants' discrimination and hostile environment complaints

9

with Abbott would violate Plaintiff Abbott's civil rights.[8] Plaintiffs fail to comprehend or acknowledge that the right to not suffer discrimination is a civil right as well, and sometimes competing rights warrant examination of the facts and circumstances at issue before a clearer understanding of the appropriate way to proceed is determined. It is Wells' job to examine complaints, talk with all parties, and decide whether the complaint warrants further action. None of the Plaintiffs were damaged as a result of Defendant Wells' brief and low-key review of the events surrounding the November 23, 2015, event. Universities are charged with protecting the rights of all the parties involved in this situation, which may require an inquiry to sort out whose rights prevail.[9] Wells therefore did not violate any constitutional rights of the Plaintiffs, much less any clearly established constitutional rights, and therefore is entitled to qualified immunity.

## CONCLUSION

For the reasons set forth herein, the individual damage claims against Defendants Wells and Gist should be dismissed.

---

[8] In the Complaint, ECF No. 1 at 19, ¶ 83, Plaintiffs quote *Sweezy v. State of N.H.*, 354 U.S. 234, 250 (1957), which held that "[m]erely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations in a measure of governmental interference in these matters." In this case, however, Plaintiff Abbott was not subjected to compulsory process, nor was he asked to disclose anything which he had not already communicated publicly.

[9] One of the policies about which Plaintiffs complain, STAF 6.24, was drafted with the guidance and approval of the United States Department of Justice, a fact about which Plaintiffs' lawyers are aware.

Respectfully submitted,

*s/Carl F. Muller*
Carl F. Muller, Fed I.D. #3602
Carl F. Muller, Attorney at Law, P.A.
607 Pendleton Street, Suite 201 (29601)
P.O. Box 1717
Greenville, SC 29602
864.991.8904
carl@carlmullerlaw.com

and

DAVIDSON & LINDEMANN, P.A.

*BY:  s/ Kenneth P. Woodington*
WILLIAM H. DAVIDSON, II, Fed. I.D. No. 425
KENNETH P. WOODINGTON, Fed. I.D. No. 4741

DAVIDSON & LINDEMANN, P.A.
1611 DEVONSHIRE DRIVE, 2ND FLOOR
POST OFFICE BOX 8568
COLUMBIA, SOUTH CAROLINA 29202-8568
wdavidson@dml-law.com
kwoodington@dml-law.com
T: 803-806-8222
F: 803-806-8855

ATTORNEYS for Defendants

October 3, 2016