**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Ross Abbott, College Libertarians at the University of South Carolina, and Young Americans for Liberty at the University of South Carolina, | Civil Action No.: 3:16-cv-538-MBS |
| Plaintiffs, | |
| v. | **ORDER AND OPINION** |
| Harris Pastides, Dennis Pruitt, Bobby Gist, and Carl Wells, | |
| Defendants. | |

Plaintiffs Ross Abbott ("Abbott"), College Libertarians at the University of South Carolina ("Libertarians"), and Young Americans for Liberty at the University of South Carolina ("YAL")(together "Plaintiffs") bring this civil rights action pursuant 42 U.S.C. § 1983 against Defendants Harris Pastides, Dennis Pruitt, Bobby Gist ("Gist"), and Carl Wells ("Wells") (together "Defendants"), alleging that Defendants violated their rights under the First Amendment. This matter comes before the court on Defendants' two motions for summary judgment and Plaintiffs' cross-motion for partial summary judgment.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs planned a Free Speech Event at the University of South Carolina ("USC") to draw attention to threats to free expression on college campuses. ECF No. 1 at 5. Plaintiffs planned "to create visual displays and handouts depicting censorship controversies that have occurred at USC and other universities throughout the country." *Id.* Prior to the event, Abbott met with Director of Campus Life and the Russell House University Union, Kim McMahon. *Id.* Abbott provided Ms. McMahon a synopsis of the planned event, including details describing the types of visuals that Plaintiffs intended to display. *Id.* at 6. Abbott subsequently obtained the proper space and facilities

reservation to hold the event in front of the Russell House Union Building, a building located within USC's "free speech zone." *Id.*[1]

The Free Speech Event took place on November 23, 2015, as planned. Plaintiffs "displayed posters and hand-outs referencing censorship incidents at other universities." *Id.* at 6. Some of the incidents highlighted included an incident where a student was threatened punishment because of distributing copies of the United States Constitution on Constitution Day outside of a university's designated areas for free speech, and an incident where a university's policies failed to recognize a pro-choice group as a student organization. *Id.* at 6-7. Further, the word "wet back" and a picture of a swastika were among the visual displays. *Id.* Contextual background for all of the incidents displayed were provided by Plaintiffs.

During the event, members of the campus community called USC officials to complain about the displays. These complaints were forwarded to Ms. McMahon by email. ECF No. 27-3 at 2. One particular email from the Director of the Office of Multicultural Student Affairs stated, "I am getting calls from everyone from faculty to the Columbia Jewish Federation concerning the swastika on Greene [S]treet." *Id.* Ms. McMahon responded to the email noting, "This is free speech and they are in a free speech area and if they are being respectful and trying to help learn and create dialogue then I am not sure how to help those that are uncomfortable about it." *Id*. Ms. McMahon responded again in a subsequent email wherein she continued to describe the purpose of the event, writing, "Discomfort is not surprising but they are hosting a free speech education event with a variety of situations that have been cited as examples of violation of free speech on other campuses. As I am

---

[1] Under STAF 3.17, USC designates areas on campus available for solicitation activities. Plaintiffs "Free Speech Event" fell under the definition of "non-commercial solicitation" for purposes of a space and facilities reservation.

not there I can't provide context and if group is doing what their event said it would." ECF No. 27-4 at 2.

On November 24, 2015, Wells, Assistant Director of the Office of Equal Opportunity Programs ("EOP"), sent a letter to Abbott stating that three students filed Formal Complaints of Discrimination. ECF No. 1-14 at 2. One student complained of Plaintiffs' behavior at the event, including, "engaging rudely with USC students, saying sexist and racist statements." ECF No. 1-14 at 8. In reference to Plaintiffs' display of a swastika at the event, another student complained that a friend "was violently triggered by seeing the symbol, and now feels unsafe on campus." *Id*. at 11.

The letter sent to Abbott indicated that a "Notice of Charge" and copies of the official student complaints were enclosed. *Id.*[2] Abbott was instructed to contact the EOP office within five days to "arrange an appointment to fully discuss the charges as alleged." *Id.* Abbott was directed not to contact any of the complainants, and not to discuss the issue with other members of the campus community. *Id.* The letter further provided:

> With respect to a complaint that is filed with this office we shall as a matter of policy attempt to resolve the complaint through mutually agreeable mediation. Should we be unable to mediate a complaint we shall move to investigate the complaint and we shall upon completion of our investigation, issue to all parties a copy of our findings and recommendations which we shall make to the Provost and President of the University.

*Id.*

On November 24, 2015, Abbott called Wells to discuss the letter. ECF No. 1 at 10. Abbott states that during his conversation with Wells, "Mr. Wells confirmed that an investigation into the complaints would comply with University policy EOP 1.01, which details Equal Opportunity

---

[2] Defendants argue that the letter sent to Abbott was a not a formal "Notice of Charge." Instead, Defendants state that the inclusion of language that instructed that a "Notice of Charge" was attached was a scrivener's error as no "Notice of Charge" was attached, and no official investigation had commenced.

Complaint procedures." ECF No. 57-1 at 5.

On December 8, 2015, Wells met with Abbott, who was joined by Michael Kriete ("Kriete"), the President of YAL. ECF No. 1 at 13. The meeting lasted forty-five minutes and was recorded by Abbott. *Id*. At the beginning of the meeting, Abbott provided Wells with a letter setting forth his defense to the Free Speech Event. ECF No. 27-5 at 7. The letter also listed actions USC "would need to take to prevent its policies from chilling the exercise of constitutionally protected speech." ECF No. 1 at 14. Abbott explained the purpose of the free speech event and expressed his concerns with the meeting. ECF No. 27-5. Wells confirmed that the meeting was a pre-complaint/pre-investigation remedy to obtain more information concerning the details of the event in response to the student complaints. ECF No. 27-5 at 3.

On December 23, 2015, Wells sent a letter to Abbott notifying Abbott that the EOP Office "will not move any further in regard to this matter. The Office of Equal Opportunity Programs has found no cause for investigating this matter." ECF No. 27-6 at 2. On February 23, 2016, Plaintiffs brought the underlying action. ECF No. 1. First, Plaintiffs raise an "as-applied" challenge, asserting that when Defendants required Abbott to attend a meeting to address student complaints, Defendants unconstitutionally applied USC policies to Plaintiffs in a way that chilled Plaintiffs' speech. Next, Plaintiffs allege USC's "policies and actions create a hostile atmosphere for free expression on campus, chilling the speech of other registered student organizations, as well as students, who are not before the court." ECF No. 1 at 17.

Plaintiffs challenge USC's Student Non-Discrimination and Non-Harassment Policy, STAF 6.24; and the *Carolinian Creed* as unconstitutional, claiming that the terms of both are broad and undefined and "vest University officials with unbridled discretion in their ability to review and restrict student speech." *Id*. at 21. Plaintiffs argue that the types of speech prohibited in STAF

4

6.24– "'unwelcome' and 'inappropriate' speech, including 'objectionable epithets, demeaning depictions,' 'unwelcome and inappropriate letters, telephone calls, electronic mail, or other communication,' 'repeated inappropriate personal comments,' speech that employs 'sexual innuendos and other sexually suggestive or provocative behavior,' and even 'suggestive or insulting gestures or sounds'"– is unconstitutionally vague. *Id.*

STAF 6.24's definitions of "harassment" and "sexual harassment" state, in pertinent part:

> Harassment is a specific type of illegal discrimination. It includes conduct (oral, written, graphic, or physical) which is directed against any student or group of students because of or based upon one or more of the characteristics articulated in Section II above, that is sufficiently severe, pervasive, or persistent so as to interfere with or limit the ability of an individual or group to participate in or benefit from the programs, services, and activities provided by the University.

> Such harmful conduct may include, but is not limited to, objectionable epithets, demeaning depictions or treatment, and threatened or actual abuse or harm. Harassment does not include the use of materials by students or discussions involving students related to any characteristic articulated in Section II for academic purposes appropriate to the academic context.

ECF No. 1-16 at 3.

> Sexual harassment is a specific type of discrimination which is defined as unwelcome conduct of a sexual nature that is sufficiently severe or pervasive that it adversely affects a student's or student group's ability to participate in or benefit from the programs and services provided by the University. Examples of conduct that may constitute sexual harassment in violation of this policy include, but are not limited to, the following types of unwelcome and harmful behavior:
>
>     a.   Physical Conduct
>         i.    Unnecessary or unwanted touching, patting, massaging, etc.
>         ii.   Impeding or blocking movements
>         iii.  Acts of sexual violence
>         iv.  Other unwanted conduct of a physical nature
>
>     b.   Non-Verbal Conduct
>         i.    Suggestive or insulting gestures or sounds
>
>     c.   Verbal conduct
>         i.    Direct propositions of a sexual nature

      ii.      Sexual innuendos and other sexually suggestive or provocative behavior

      iii.     Repeated, unwanted requests for dates

      iv.     Repeated inappropriate personal comments

      v.      Unwelcome and inappropriate letters, telephone calls, electronic mail, or other communication or gifts

      vi.     Requests for sexual favors

Sexual harassment may occur between members of the same or opposite sex. Sexual harassment directed at any student or other member of the University community, regardless of his or her sexual orientation, is a violation of this policy.

Sexual harassment does not refer to occasional, nonsexual compliments, nonsexual touching, or other nonsexual conduct.

*Id.* at 3-4.

The *Carolinian Creed*, which encourages students to adhere to the following ideals, provides:

A.     I will practice personal and academic integrity.

A commitment to this ideal is inconsistent with cheating in classes, in games, or in sports. It should eliminate the practice of plagiarism or borrowing another student's homework, lying, deceit, excuse making, and infidelity or disloyalty in personal relationships.

B.     I will respect the dignity of all persons.

A commitment to this ideal is inconsistent with behaviors which compromise or demean the dignity of individuals or groups, including hazing, most forms of intimidating, taunting, teasing, baiting, ridiculing, insulting, harassing, and discrimination.

C.     I will respect the rights and property of others.

A commitment to this ideal is inconsistent with all forms of theft, vandalism, arson, misappropriation, malicious damage to, and desecration or destruction of property. Respect for other's personal rights is inconsistent with any behavior which violates their right to move about freely, express themselves in a civil manner, and to enjoy privacy.

D.     I will discourage bigotry, striving to learn from differences in people, ideas, and opinions.

A commitment to this ideal pledges affirmative support for equal rights and

opportunities for all students regardless of their age, sex, race, religion, disability, ethnic heritage, socioeconomic status, political, social or other affiliation or disaffiliation, or affectional preference.

E.    I will demonstrate concern for others, their feelings, and their need for conditions which support their work and development.

A commitment to this ideal is a pledge to be compassionate, civil, and considerate, to avoid behaviors which are insensitive, inhospitable, or incident which unjustly or arbitrarily inhibit another's ability to feel safe or welcomed in their pursuit of appropriate goals.

F.    Allegiance to these ideals obligates each student to refrain from and discourage behaviors which threaten the freedom and respect all USC community members deserve.

This last clause reminds community members that they are not obliged to avoid these behaviors, but that they also have an affirmative obligation to confront and challenge, respond to or report the behaviors whenever or wherever they are encountered.

ECF No. 1-17.

Last, Plaintiffs challenge STAF 3.17 and STAF 3.25, contending that both policies have allowed Defendants to promulgate and enforce a *de facto* "Free Speech Zone" policy "that prohibits free expression on all but a tiny fraction of the University of South Carolina's campus." *Id.* at 22. Specifically, Plaintiffs argue that "Sections II.A and II.H.2 of STAF 3.17 limit expressive 'solicitation activities' . . . to a few small 'designated' areas and locations, and prohibit it in the residence halls." ECF No. 49-1 at 59. Section II. A. reads:

Solicitation is defined as contact for the purpose of:

1.    Soliciting funds or sales or demonstrations that may result in sales;

2.    Distributing advertising or other materials;

3.    Compiling data for surveys, programs, or other purposes;

4.    Recruitment of members or support for an organizations or cause;

7

> 5.    Providing educational information sessions (exclusive of formal University of South Carolina academic classes).

ECF No. 1-19 at 2.

Section II.H.1 further details that organizations or students seeking to use space for events "must complete a USC Facility Reservation and Event Registration Form to the Russell House University Union event services coordinator." ECF No. 1-19 at 4. Plaintiffs challenge both STAF 3.17's advance registration and fee requirement. *Id.* Finally, Plaintiffs challenge STAF 3.25, as it "imposes a two-week registration requirement for any outdoor event held on campus." ECF No. 1 at 17.

Plaintiffs seek:

A.    A declaratory judgment stating that Defendants' Student Non-Discrimination and Non-Harassment Policy, facially and as-applied to Plaintiffs, is unconstitutional facially and as-applied, and that they violated Plaintiffs' rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

B.    A permanent injunction restraining enforcement of Defendants' unconstitutional Student Non-Discrimination and Non-Harassment Policy and its underlying enforcement practices;

C.    An injunction requiring the Defendants to remove any notation of the complaints against Plaintiffs' Free Speech Event from University records;

D.    A declaratory judgment that Defendants' review of Plaintiffs' expressive activity violated their First and Fourteenth Amendment rights;

E.    Monetary damages in an amount to be determined by the Court to compensate Plaintiffs for the impact of a deprivation of fundamental rights;

F.    Plaintiffs' reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988, and other applicable law; and

G.    All other further relief to which Plaintiffs may be entitled.

ECF No. 1 at 26-27.

On October 3, 2016, Gist and Wells moved for summary judgment based on qualified immunity as well as the absence of any claim for damages against them. ECF No. 27 at 1. On October 25, 2016, all Defendants filed a second motion for summary judgment on the remaining issues. ECF No. 36. In that motion, Defendants assert that they "are entitled to dismissal because some of the University policies challenged by Plaintiffs in this action have been amended to eliminate any conceivable issue about the policies' constitutionally, and because any remaining policies, i.e., those which have not been amended, are not unconstitutional." ECF No. 36-1 at 1.

On November 14, 2016, Plaintiffs filed a response in opposition to Defendants' motions for summary judgment and a cross-motion for partial summary judgment. ECF No. 48 and 49.[3] First, Plaintiffs contend that there remain factual disputes concerning Gist's involvement in the matter, making summary judgment as to Gist premature. ECF No. 49 at 1. Plaintiffs contend, however, that summary judgment should be granted in their favor as it relates to Wells. Plaintiffs assert that Wells' investigation burdened Plaintiffs' First Amendment rights in five specific ways: (1) "Wells' letter initiated an investigative process under USC policies that favored the complainant and placed the burden firmly on the speaker"; (2) "initiating an investigation under USC's policies threatened to impose significant penalties on Plaintiffs for their speech, as the complainants demanded"; (3) "USC's process for reviewing complaints does not employ adequate substantive standards or the least restrictive means of addressing allegations of harassment, and the application of those policies to Plaintiffs had a significant chilling effect"; (4) "USC's investigation did more than just chill speech because Wells' letter also had the immediate effect of imposing a 'gag order' on Plaintiffs";

_____

[3] Plaintiffs filed ECF No. 48 and 49 separately for docket clarity; however, the motions are identical. For purposes of this order, the Court will cite to ECF No. 49 when referring to Plaintiffs' response in opposition to Defendants' motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment.

and (5) "Defendants' claim that there can be no chilling effect here because USC terminated the investigation is false."  ECF No. 49-1 at 33-42.

Defendants responded in opposition to Plaintiffs' motion for partial summary judgment by arguing that (1) Plaintiffs lack standing to assert facial challenges to USC policies; (2) STAF 6.24 is constitutional; (3) the *Carolinian Creed* has always been a non-enforceable, aspirational document, and does not affect Plaintiffs' rights in any way; and (4) Plaintiffs' challenge to STAF 3.17 and STAF 3.25 is moot because Defendants have revised both policies.  ECF No. 55.

On December 21, 2016, Plaintiffs filed a reply to Defendants' opposition.  In summation, Plaintiffs argue the court should grant Plaintiffs' motion for partial summary judgment on their as-applied challenge because:  (1) the First Amendment bars intrusive investigations and threats of sanction; and (2) USC's investigation violated Plaintiffs' First Amendment rights. Plaintiffs assert the court should grant Plaintiffs' cross-motion for partial summary judgment on their facial challenge to STAF 6.24 because: (1) Plaintiffs' standing to challenge a policy applied to them is obvious; (2) Defendants have no substantive response to STAF 6.24's constitutional deficiencies; and (3) Plaintiffs' challenge to STAF 3.17 and STAF 3.25 has not been mooted by amendments to the policies. ECF No. 57. Additionally, Plaintiffs attached the affidavits of Abbott and Kriete describing how their speech was chilled by Defendants' actions. ECF No. 57-1, 57-2.

On January 19, 2017, the court held a hearing on Defendants' motions for summary judgment and Plaintiffs' cross-motion for partial summary judgment. ECF No. 58.

## II.  LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of

the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).

### III. ANALYSIS

Plaintiffs who allege violations pursuant to § 1983 must establish: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). State officials sued in their individual capacities are "persons" within the meaning of § 1983. *Hafer v. Melo*, 502 U.S. 21, 31 (1991).

**A.**     **Plaintiffs' As-Applied Challenge (Count One)**

Count One of Plaintiffs' complaint alleges that "by investigating Plaintiff Ross Abbott's involvement in Plaintiffs' Free Speech Event, Defendants have explicitly and implicitly chilled Plaintiffs' free expression as well as that of all USC students." ECF No. 1 at 19. Gist and Wells seek summary judgment and dismissal as to Count One pursuant to qualified immunity. ECF No. 27.

Government officials are protected under the doctrine of qualified immunity from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In such cases, the court is faced with determining the "'objective legal reasonableness' of the action, accessed in the light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

11

1.    *Clearly established right*

Pure speech is protected under the First Amendment of the Constitution, and such protection

extends to school campuses. *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 506

(1969). Further, "entertainment as well as political and ideological speech, is protected . . . within

the First Amendment guarantee." *Iota XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,

993 F.2d 386, 389 (4th Cir. 1993)(internal citations omitted).

Universities are not immune from "the sweep of the First Amendment." *Healy v. James*, 408

U.S. 169, 180 (1972). Indeed, "[i]t can hardly be argued that either students or teachers shed their

constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S.

at 506. While courts have recognized the need for affirming the authority of school officials to

proscribe and control conduct, courts have not determined that First Amendment protections "should

apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 181.

"In the absence of a specific showing of constitutionally valid reasons to regulate their speech,

students are entitled to freedom of expression of their views." *Tinker*, 393 U.S. at 511.

Here, Plaintiffs' rights to freedom of expression and speech are clearly established.

Therefore, the court must decide if Plaintiffs' rights were violated when Defendants held a meeting

with Plaintiffs to further discuss student complaints regarding Plaintiffs' Free Speech Event.

2.    *Violation of clearly established right*

While all students on University campuses have First Amendment rights to free speech, such

rights are not absolute. Indeed, the Supreme Court has "held repeatedly that a content-based

regulation of protected expression survives judicial scrutiny if it is necessary to serve a compelling

state interest and is narrowly drawn to achieve that end." *Sigma Chi Fraternity,* 993 F.2d at 394

(Murnaghan, J., concurring) (quoting *Simon & Schuster, Inc. v. New York Crime Victims Bd.*, 602

U.S. 105, 118, 1991)).  The Supreme Court has "recognized that regulation of speech based on its content is not only permissible but, in limited circumstances, justified."  *Id.*  Such areas of justification would occur if speech was determined to infringe upon other students' rights to be free from discrimination, as universities have "a substantial interest in maintaining an educational environment free of discrimination and racism. . . ."  *Id.* at 393.  "Under certain circumstances racial and ethnic epithets, slurs, and insults might fall within this description and could constitutionally be prohibited by the University."  *Doe v. University of Michigan*, 721 F. Supp. 852, 862 (1989).

In cases where it is alleged that government action violated a plaintiff's First Amendment rights, the plaintiff may show an injury by establishing self-censorship.  *See Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013).  Self-censorship occurs when a claimant "is chilled from exercising her right to free expression." *Benham v. City of Charlotte,* 635 F.3d 129, 135 (4th Cir. 2011)(internal quotations and citations omitted).  Allegations of "subjective chill" are not sufficient. *Larid v. Tatum*, 408 U.S. 1, 13 (1972).  Still, claimants need not show that they completely ceased activity to prove an injury.  *Benham*, 635 F.3d at 135.  Indeed, "[c]onduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, and a plaintiff need not actually be deprived of her First Amendment rights" in order to establish a valid claim.  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).  "Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights."  *Benham*, 635 F.3d at 135 (internal quotations and citations omitted).

Plaintiffs argue that other students of "ordinary firmness" would experience a chilling effect after receiving a letter from a member of USC's administration referencing a "Notice of Charge" and requiring the student to attend a meeting to discuss formal student complaints.  Plaintiffs claim that between receiving the letter from Wells on November 24, 2015, until the filing of the underlying

13

action on February 23, 2016, the College Libertarians "avoided putting on any public events at USC." ECF No. 57-1 at 6. Abbott states that, "as College Libertarians events often focus on controversial public policy and free speech issues, holding an event such as the kick-off (or anything similar to the prior Free Speech Event) was impeded by the real possibility that if a member of the University community complained again, I or other members of the College Libertarians group would again face possible discipline, or in the least, be called in by Mr. Wells or another administrator to justify our actions." *Id.* Abbott also details that Plaintiffs had planned to cancel their Marijuana Legalization Rally but felt that they could host the event only after filing the underlying suit. *Id.* at 7.

Kriete shared similar sentiments, stating that between the time Abbott received the letter from Wells and Plaintiffs filed the underlying lawsuit, "YAL was hesitant to put on any public events at USC. On February 17, 2016, we decided to go ahead and have a pro capitalism event on campus. We knew that the lawsuit was about to filed at this time. However we were worried that students might find this event offensive and could result in our group and us as individuals being punished by the University for offending students. Although we went ahead, we were hesitant to engage with students who disagreed with our event out of fear they would complain to the University and we would be further punished." ECF No. 57-2 at 4.

A student who receives a letter indicating that a "Notice of Charge" is attached and prohibiting him from discussing the letter with others, could feel he or she was subject to discipline. The student reasonably could believe that the "Notice of Charge" inadvertently was not enclosed. For purposes of summary judgment, the court finds that Plaintiffs' speech was chilled in that a student of "ordinary firmness" may have self-censored his or her future speech while awaiting notice

14

from Wells on the status of the official student complaints.[4]  The question becomes, then, whether USC's investigation of the student complaints was necessary to serve a compelling state interest and is narrowly drawn to achieve that end.

USC was required under Title VI of the Civil Rights Act of 1964 and mandates from the United States Department of Education to ensure that no students had been unlawfully discriminated against as a result of the Free Speech Event.[5]  To do so, USC had an obligation to employ a method of balancing both students' rights to freedom of speech and rights to be free from discrimination.

In *Sigma Chi Fraternity*, the plaintiff fraternity held an event called the "ugly woman contest" where members dressed up as caricatures of different women.  *Id.* at 387. One such member was painted black attempting to imitate an African-American.  *Id*. at 388. The event garnered numerous campus community complaints and protests to university officials.  *Id.* After the event, the University engaged in several meetings with the complainants and the fraternity.  *Id.*  The University decided to sanction the fraternity by suspending it from all activities for the rest of the spring semester.  *Id.*  The University also imposed "a two-year prohibition on all social activities except pre-approved pledging events and pre-approved philanthropic events with the educational purpose

---

[4] Even if Abbott believed before attending the meeting that he was in danger of disciplinary action, those fears should have been assuaged after he attended the meeting, which was held fifteen days later.  Throughout the meeting, Wells clarified that there were no charges against Abbott, and that the meeting was being held to obtain Abbott's response to the student complaints. Finally, USC declined to pursue an investigation of the event after confirming with Plaintiffs that the event had been held as Plaintiffs represented it would be.  ECF No. 27-6.

[5] Pursuant to EOP 1.01, The Executive Assistant to the President for Equal Opportunity Programs is tasked with implementing "equal opportunity and affirmative action in education and employment for all persons regardless of race, color, religion, gender, national origin, age, disability, sexual orientation, genetics or veteran status." ECF No. 1-15 at 2. To pursue this goal, the Executive Assistant to the President for Equal Opportunity Programs has a responsibility to investigate complaints under EOP 1.01 "to insure compliance with applicable federal and state statutes relating to non-discrimination in employment and education." *Id.*

directly related to gender discrimination and cultural diversity." *Id.*

The Fourth Circuit determined that the University in *Sigma Chi Fraternity* violated the students' First Amendment rights to Free Speech.  The Fourth Circuit emphasized that "'the manner of [the University's] action cannot consist of selective limitations upon speech.'"  *Sigma Chi Fraternity*, 993 F.2d at 393 (*R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992)).  The Fourth Circuit observed:

> The University certainly has a substantial interest in maintaining an educational environment free of discrimination and racism, and in providing gender-neutral education. Yet it seems equally apparent that it has available numerous alternatives to imposing punishment on students based on viewpoints they express.  We agree wholeheartedly that it is the University officials' responsibility, even their obligation, to achieve the goals they have set.  On the other hand, a public university has many constitutionally permissible means to protect female and minority students. . . .The University should have accomplished its goals in some fashion other than silencing speech on the basis of its viewpoint.

*Id.*

In this case, unlike the University in *Sigma Chi Fraternity*, USC knew of the content of the Free Speech Event, approved the event, and ultimately determined that the event was an acceptable exercise of Plaintiffs' First Amendment rights.  USC never attempted to silence Plaintiffs' speech, sanction Plaintiffs for their speech, or prevent students from engaging in similar speech in the future. Instead, Defendants chose a narrow approach to addressing the rights of all students on campus: those who participated in the event and those who felt discriminated by it.

The court concludes that, as a matter of law, the inquiry by Wells was a narrowly drawn solution that was necessary to serve USC's compelling interest in protecting students' rights to be free from discrimination based on race, gender, religion, or other attributes.

16

**B.    Facial Challenges to USC Policies (Counts Two, Three, and Four)**

    *1.    STAF 6.24*

Plaintiffs argue that the court should enjoin USC's Non-Discrimination and Non-Harassment Policy (STAF 6.24) as unconstitutional because it is vague, overly broad, restricts speech using "amorphous and undefined terms," and fails to implement the required constitutional standard. ECF No. 49-1 at 36-45. Defendants counter Plaintiffs' assertion, claiming that Plaintiffs lack standing to bring a claim against the policy, and even if they do have standing, the policy is constitutional. ECF No. 26.

    *a.    Standing.*

A plaintiff seeking injunctive relief may not rely on prior harm. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Standing to seek injunctive relief does not exist absent a "showing of any real or immediate threat that the plaintiff will be wronged again," or, in other words, a "likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). A "speculative . . . claim of future injury" does not establish standing to seek equitable relief. *Id.*

When a case presents a constitutional challenge under the First Amendment, rigid standing requirements are relaxed. *Cooksey*, 721 F.3d at 235. "A regulation that burdens speech creates a justiciable injury if on its face it restricts expressive activity by the class to which the plaintiff belongs, or if its presence otherwise tends to chill the plaintiff's exercise of First Amendment rights." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010). For standing purposes, the plaintiff must show that the regulation presents a credible threat of enforcement against the party bringing suit that is not "imaginary or wholly speculative." *Babbitt v. United Farm*

*Workers Nat'l Union,* 442 U.S. 289, 302 (1979).  Plaintiffs may bring a pre-enforcement suit when they can establish that they intend to engage in conduct that is proscribed by a statute, and that there exists some credible threat of enforcement thereunder.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).

### i.    Intent to Violate the Challenged Law

The court must determine if Plaintiffs have shown, concretely, that they intend to violate the challenged law.  *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010).  "Plaintiffs must articulate a concrete plan to violate the law in question by giving details about their future speech such as when, to whom, where, or under what circumstances."  *Id*. (internal quotations omitted).  The allegations must be specific enough so that the court need not speculate on the types of speech or political activity in which the claimants intend to engage.  *Id*.

Plaintiffs' Free Speech Event focused on speech used for an academic discourse on First Amendment rights, which is speech not covered by the sexual harassment and discrimination policy.  Examples of events that Plaintiffs intend to host include Marijuana Legalization Rallies, educational political ideology quizzes, a "Carolina Clash" to debate between College Republicans and College Democrats, a kickoff event, or "anything similar to the prior Free Speech Event."  ECF No. 57-1 at 6-7.  As stated above, Plaintiffs should be satisfied following the meeting with Wells that "anything similar to the prior free speech event" does not constitute speech regulated by the harassment policy.  Plaintiffs have failed to show that they intend to violate STAF 6.24.

### ii.    Credible Threat of Enforcement

To demonstrate a credible threat of enforcement, a plaintiff can establish several factors:  "(1) past enforcement against plaintiff; (2) official threats of enforcement made specifically against plaintiff; and (3) frequency of enforcement against similarly situated persons."  *Boston Correll v.*

*Herring*, 212 F. Supp. 3d 584, 601 (E.D. Va. 2016). Further, some courts have found that plaintiffs have standing to facially challenge University policies based on pre-enforcement claims. For example, the plaintiff in *Doe v. University of Michigan* was a psychology graduate student who brought a suit against the University of Michigan, alleging that its harassment policy chilled his speech and that he could potentially be sanctioned under its overbroad terms. 721 F. Supp. 852, 858 (E.D. Mich. 1989). The policy at issue stated that students could be subject to discipline for "any behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap, or Vietnam-era veteran status. . . ." *Id.* at 856. The student brought the suit because he believed his studies, which focused on biological bases of individual difference in personality traits and mental abilities, could be deemed "sexist" or "racist." *Id.* at 858.

The *Doe* court noted that, "[W]ere the court to look only at the plain language of the Policy, it might have to agree with the University that Doe could not have realistically alleged a genuine and credible threat of enforcement." *Id.* at 859. The court in *Doe* took an additional step and looked at the intent of the policy through reference to the policy's "legislative history, the Guide, and experiences gleaned from enforcement." *Id.* at 859. The record indicated that "the drafters of the policy intended that speech need only be offensive to be sanctionable." *Id.* Further, the record provided evidence of several instances where the administration used the policy to regulate academic speech. *Id.* at 861. Taking the complete record into account, the *Doe* court determined there was a realistic and credible threat that Doe's speech could be sanctioned. *Id.* at 860. The court in *Doe* invalidated the policy because it "was simply impossible to discern any limitation on its scope or any conceptual distinction between protected and unprotected conduct." *Id*. at 867.

The within litigation is distinguishable from *Doe* and similar cases. In the court's view, the

present case is more analogous to *Rock for Life*, where the plaintiffs sought to facially challenge the University of Maryland, Baltimore County's ("UMBC") sexual harassment policy as chilling their speech when they were not allowed to host an event on the campus space of their choice. The Fourth Circuit found that the UMBC officials never threatened to punish the plaintiffs' speech as sexual harassment, and that UMBC "never undertook a 'concrete act' to investigate or sanction the plaintiffs for violation of the code of conduct." 411 F. App'x at 549. The Fourth Circuit concluded that the plaintiffs were unable to demonstrate a credible threat of enforcement, and, as a result, the plaintiffs did not have standing to assert their claim. *Id.*

In this case, Abbott states in his affidavit, "Mr. Wells' December 23 letter did not clarify for me whether the University's policies on harassment and discrimination as set forth in STAF 6.24 and other rules could be used —as they were in response to the Free Speech Event— to impose enforcement and possible disciplinary measure on students like myself or members of College Libertarians and YAL who engaged in otherwise constitutionally-protected expression." ECF No. 57-1 at 6. However, Plaintiffs did not present any evidence that there has been frequent actual or threatened use of STAF 6.24 to silence the types of speech in which Plaintiffs were engaging.

STAF 6.24 defines harassment as it pertains to sexual harassment, clarifies that the policy does not regulate academic speech, sets forth clear examples of how the policy is violated, and the proper procedures for enforcement. The language of STAF 6.24 makes it clear that the policy would not be applied to the speech in which Plaintiffs or similarly situated students intend to participate. There is no support in the record to establish that there is a credible threat of enforcement of STAF 6.24 against Plaintiffs or similarly situated students. The court concludes that Plaintiffs lack standing to challenge STAF 6.24 as facially unconstitutional.

2.    *STAF 3.17 and 3.25 and the Carolinian Creed*

Plaintiffs raise facial challenges to USC policies STAF 3.17 and 3.25.  ECF No. 49-1. Unlike STAF 6.24, the Facilities and Solicitation policies, STAF 3.17 and STAF 3.25, were applied to Plaintiffs, as both policies regulated campus events. The *Carolinian Creed* applied to all students. Plaintiffs have standing to contest the constitutionality of these policies.

Following the commencement of this case, Defendants revised STAF 3.17 and STAF 3.25 to cure any deficiencies raised by Plaintiffs' complaint.  ECF No. 36-8, 36-10.  Plaintiffs do not claim that the policies are unconstitutional in their amended state.   Instead, Plaintiffs assert that "Defendants face a 'heavy burden' of establishing the challenged policies will not be reinstated (or continued to be enforced despite 'official' amendment)."  *Id.* at 57.

> As a general rule, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." But jurisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that "there is no reasonable expectation. . ." that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.  When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying question of fact and law.

*Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)(internal citations omitted).

A challenge to a facilities policy indicating that the University has too much control over student-planned events is a challenge premised on overbreadth. *Rock for Life-UMBC*, 411 F. App'x at 550 (4th Cir. 2010).  "When a facially overbroad regulation is subsequently narrowed within constitutional boundaries, the inherent threat of content-based discrimination becomes null."  *Id.* Further, "statutory changes that discontinue a challenged practice are 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" *Valero v. Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000)(internal citation

omitted).

In its original form, STAF 3.17 made no distinction between what types of speech required a solicitation fee. ECF No. 36-7 at 5. After revisions, STAF 3.17 states that non-commercial solicitation activities, like those participated in by Plaintiffs, are not subject to a fee. ECF No. 36-8 at 5. "Non-commercial solicitation" was not defined in the original policy, making it unclear what types of speech required fees. The revised policy eliminates any vagueness and defines such non-commercial solicitation as "any distribution by students individually or as members of student organizations of leaflets, brochures or other written material, or oral speech by them to a passerby, conducted without intent to obtain commercial or private pecuniary gain." ECF No. 36-8 at 2. STAF 3.25 was changed to lessen the amount of time required to host an outdoor event from two weeks advance notice to three day advance notice, and only in cases where the event would use amplified sound and host over 150 people. ECF No. 36-10 at 3. The *Carolinian Creed* was an unenforceable statement of ideals that USC repealed and removed from USC's policies. ECF No. 46. The court finds that changes made to the policies "eradicate the effects" of the alleged violations.

With respect to reinstatement, injunctive relief is appropriate unless the court can determine, with a degree of certainty, that USC would not reinstate the prior versions of STAF 3.17 and 3.25 and the *Carolinian Creed*. *See DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008). Defendants have submitted an affidavit from Dennis Pruitt, Vice President for Student Affairs, Vice Provost and Dean of Students at USC, that details the repeal of the *Carolinian Creed* and revisions to STAF 3.17 and 3.25. ECF No. 55-1. Pruitt avers that "USC does not intend to reverse any of these changes at any time in the future . . . The existence of the present lawsuit simply pointed up the need for these relatively minor changes in order to obviate any possible First Amendment concerns. There is

nothing about them that would cause USC to have any interest in reinstating them once the present lawsuit it over." ECF No. 55-1 at 3-4.

The court concludes that USC voluntarily ceased the allegedly illegal conduct and the allegations have become moot. The court declines to issue injunctive relief against any future revision to the policies.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 27) and Defendants' second motion for summary judgment (ECF No. 36) are hereby **GRANTED**. Plaintiffs' cross-motion for summary judgment (ECF No. 49) is **DENIED**, and the case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

July 11, 2017

23